IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Marriage of | ) | No. 36040-7-III |
| | ) | |
| EDWARD A. MILLER, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | UNPUBLISHED OPINION |
| and | ) | |
| | ) | |
| RITA L. YTURRI-SMITH, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — In this appeal, Rita Smith appeals numerous rulings of the

dissolution court surrounding distribution of the parties' assets and the award of

maintenance. We affirm all but one of the trial court's rulings.

FACTS

This appeal concerns the dissolution of the marriage between Edward (Ed) Miller

and Rita Yturri-Smith (Smith). At the time of their dissolution trial, husband Ed Miller

was 63 years old. Miller graduated from Spokane Falls Community College with an

associate of arts degree. In 1985, Miller began a successful career in advertising with the

Spokane firm of Clark White, Inc. Clark White later became WhiteRunkle Associates,

Inc. (WhiteRunkle). In 1993, WhiteRunkle founders awarded Miller 458 shares, or five percent, of the company's corporate stock.

Ed Miller gained his 458 shares of WhiteRunkle by a November 1, 1993, share transfer agreement executed by Miller, WhiteRunkle, and the other company shareholders, Jack White and Robert Runkle. The agreement restricted the shareholders' right to dispose of their shares in order to assure the continuation of the sound and harmonious management of the advertising company and to protect against the disruptive result of outsiders acquiring stock.

Wife Rita Yturri-Smith was 53 years old at the time of the marital dissolution trial. Smith graduated from Eastern Washington University with a bachelor of arts degree. Smith engaged in marketing and earned an approximate annual salary of $80,000. During the pendency of this dissolution, Smith left employment and enrolled in science and nursing courses at a local community college.

Ed Miller and Rita Smith were previously married to others before the two began dating in 2002. Smith has two adult children from her first marriage. Miller and Smith bore no children from their relationship.

In December 2003, Ed Miller moved into Rita Smith's home (the "Glennaire" home). This date is important because the trial court found that is when the parties entered a committed intimate relationship equivalent to a marriage.

In December 2003, Rita Smith and her former husband were in the midst of divorcing and jointly owned the Glennaire abode. Ed Miller and Smith agreed that Miller should buy an interest in the Glennaire residence. Smith's former husband conveniently wished to purchase Miller's home located on North Vista Court, in Spokane. The parties entered a sales agreement. Under the agreement, (1) Miller acquired a 77.15 percent interest in the Glennaire residence, (2) Miller's payment for his interest retired the Smiths' mortgage on Glennaire, (3) Rita Smith retained a 22.85 percent interest in the Glennaire residence, and (4) Smith's former husband ratified his promise to satisfy both community debts assigned to him in the Smith dissolution decree.

Before cohabitating with Ed Miller, Rita Smith owned, with her mother, a home on Lake Coeur d'Alene. Throughout the relationship, Miller and Smith utilized the lake home and made mortgage payments on the residence.

We return to the advertising business of Ed Miller. WhiteRunkle paid its three shareholders, Jack White, Robert Runkle, and Ed Miller bonuses each quarter. If the corporation lacked funds to pay the bonuses, the corporation posted an accounting entry,

3

under which the corporation owed the shareholder for the amount of the bonus.

WhiteRunkle carried significant accounts receivable. When collected, the accounts

receivable paid the loans to the shareholders. For example, at the close of the 2004

corporate tax year, WhiteRunkle owed $1,500,505 in loans to the shareholders as a result

of unpaid bonuses. The corporation paid those loans to the shareholders during the 2005

corporate tax year.

In 2005, Jack White and Robert Runkle wished to retire from WhiteRunkle and be

paid for their respective ownership interests in the corporation. The two held a 95 percent

interest in WhiteRunkle. On October 1, 2005, WhiteRunkle redeemed the stock of White

and Runkle for $1,000,000. The corporation paid the 2004 loans owed to its three

shareholders before paying White and Runkle the $1,000,000 for the stock redemption.

To fund the redemption of stock, WhiteRunkle used retained earnings held in a separate

account. Ed Miller did not pay from his personal funds for the redemption of White's and

Runkle's corporate shares. After White's and Runkle's departure, Ed Miller renamed the

company Miller.WhiteRunkle, Inc. (Miller.WhiteRunkle). Miller became the sole owner

of the advertising firm, although his share amount remained at 458 shares.

On November 30, 2005, Ed Miller loaned Miller.WhiteRunkle $375,000 for

unpaid compensation owed to him. Rita Smith and Ed Miller married on July 25, 2007.

4

On November 30, 2007, Miller.WhiteRunkle converted Ed Miller's 2005 $375,000 loan to the corporation into additional paid-in capital in the amount of $359,850. According to corporate CPA (certified public accountant) Zoe Foltz, converting the loan to paid-in capital gave Miller a basis in his stock for tax returns and increased stockholder's equity, although the conversion did not increase Miller's shares of stock.

On December 29, 2007, Ed Miller sold all of his shares in Miller.WhiteRunkle, Inc. to Ascentium Corporation for $2,225,000. Miller represented in the stock purchase agreement that he was the sole shareholder in Miller.WhiteRunkle. As part of the sale agreement, Miller presented to Ascentium a list of clients and all contracts to which the corporation was a party. Section 5.5 of the stock purchase agreement prohibited Miller from competing with Ascentium or soliciting clients and employees of Miller.WhiteRunkle for three years. Ed Miller agreed that the noncompete promises were necessary to protect the goodwill of the business. The first sentence of section 5.5(f) declared:

> Shareholder acknowledges and agrees that the provisions of this Section 5.5 are material and of the essence to this Agreement.

Ex. 361 at 972.

Ed Miller testified at trial to the setting of a purchase price for the Miller.WhiteRunkle stock to provide him a particular cash flow thereafter.

A  Well, immediately after pulling off the floor that somebody wanted to buy this thing [Miller.WhiteRunkle], I contacted Jerry Karstetter because he was my financial advisor, and I contacted him because I needed to know if I did sell this thing, what would I have to sell it for in order to have a certain kind of income without touching the principal.

Q  Okay.

A  And what would that figure be in order to get there.

Q  All right.  And so in order to generate a certain level of cash flow—

A  Yes.

Q  —for personal consumption, you needed to know how much money you had generating cash flow, I guess?

A  What I needed to generate the cash flow.

. . . .

Q  And was some number proffered in terms of what you needed from this sale net of tax?

A  Yes.

Q  And what was that number?

A  The number was, we calculated if a number was paid, and I took the capital gains over a year, that I would need to net 1.9 million to add to what I already had in the account.

Q  All right.  And based upon some projected rate of return that would generate some acceptable cash flow to you?

A  Three percent return is based on.

Q  Which would get you to some acceptable level of cash flow?

A  Yes.

5 Report of Proceedings (RP) (July 27, 2017) at 868-69.

Ed Miller's 2007 tax return reported the sale of Miller.WhiteRunkle to Ascentium for $2,225,000, with a tax basis of $359,850.  The 2007 tax return declared that Miller acquired, on January 1, 1993, the Miller.WhiteRunkle stock sold to Ascentium.  Ed Miller and Rita Smith's 2008, 2009, and 2010 joint tax returns also listed Miller's acquisition

6

date, for the stock sold to Ascentium, as 1993.  Miller and Smith paid taxes on the income from the stock sale on a capital gains basis rather than as ordinary income.

Ascentium paid the purchase price for Miller.WhiteRunkle in installments of $725,000 in 2008, $375,000 in 2009, and $1,125,000 in 2010.  With interest on the installments, Miller received a total of $2,607,661 for his stock in Miller.WhiteRunkle.  Miller deposited the funds into an investment fund, the Centaurus fund.

In 2008, during the parties' marriage, Ed Miller purchased a 2008 Cobalt boat.  The certificate of title for the boat listed Rita Smith's name as one of the owners.  When asked during trial why he believed the boat was his separate property, Miller replied: "[o]h, boy, because I bought it with my funds."  5 RP (July 31, 2017) at 897.

According to Ed Miller, Rita Smith exorbitantly spent money and incurred substantial credit card debt throughout the marriage.  Miller and Smith separated on November 7, 2013.  Miller moved from the Glennaire residence that month.

At the time of separation, neither spouse worked.  The couple paid their expenses from the Centaurus fund, in which Miller deposited Ascentium purchase payments.  The Centaurus fund, in addition to some pension assets in Miller's name, then totaled $3,100,000.

PROCEDURE

Ed Miller filed for divorce on March 10, 2014. On August 19, 2014, the

dissolution court entered temporary orders directing Ed Miller to pay Rita Smith $3,400

per month in maintenance. The court also required, as additional maintenance payments,

that Miller pay utilities, real estate taxes, and homeowners' insurance on the Glennaire

residence. The court also ordered Miller to pay for jewelry insurance and health and auto

insurance for Smith. The court granted control of the Centaurus fund and other pension

funds to Miller, but demanded that Miller preserve the funds.

On June 2, 2015, Rita Smith's Glennaire home sustained fire damage. The

damage from the fire was limited to the garage, laundry room, a minor part of the kitchen,

and a portion of the family room. Smith used homeowners' insurance proceeds to restore

the home. The policy named Ed Miller and Rita Smith as the insureds. Smith hired and

managed contractors who performed the repairs.

The fire destroyed contents inside the Glennaire residence. Thereafter, Rita Smith

performed an extensive eighty-five page inventory of the nonsalvageable personal

property. Much of the property consisted of tools from the garage and adult clothing. Ed

Miller lost one hundred collectibles left in the garage. He also suffered damage to

painting accessories. Smith did not separate community property from separate property

8

in her inventory. Safeco paid $355,131 for the loss of the personal property under the homeowners' policy's contents coverage.

After the August 2014 temporary orders, Ed Miller transferred $1.5 million from the Centaurus fund and pension funds into a new Centaurus account. He employed $640,000 of the transferred funds to purchase a Spokane home on Radio Lane with cash. As a result, on May 18, 2017, the dissolution court found Ed Miller in contempt of the temporary order requiring him to preserve funds. The court sought to correct the inequity caused by Ed Miller's profligate spending compared to Rita Smith's monthly maintenance. The dissolution court ordered Miller to pay Rita Smith sanctions of $10,000.00 and an additional $29,383.50 for attorney fees and costs incurred by Smith.

The dissolution court conducted a nine-day trial in July and August 2017. Seven witnesses testified. The witnesses included CPA Zoe Ann Foltz, former accountant for Miller.WhiteRunkle and its predecessor WhiteRunkle; Todd Carlson, a CPA and accounting expert hired by Ed Miller; attorney Stanley Purdue; Thomas Bro, Rita Smith's former boyfriend; Randy Berg, a residential real estate appraiser; Ed Miller; and Rita Smith.

As part of the marital dissolution, the dissolution court needed to engage in a complex tracing of the parties' assets and spending. To that end, the court admitted as exhibits, during trial, 150 financial records.

Ed Miller testified regarding his sale of Miller.WhiteRunkle to Ascentium in 2007 for $2,225,000. Miller attempted, but failed, to find a signed copy of the stock sale agreement. He testified that he did not know whether a signed stock sale agreement between Ascentium and him existed. Miller did not recall signing an agreement. Nonetheless, he and Ascentium reached a stock purchase agreement.

The trial court admitted, as exhibit 361, a December 29, 2007, unsigned copy of a stock purchase agreement between Ascentium Corporation, Miller.WhiteRunkle, and Ed Miller. The exhibit was a draft exchanged during the negotiation of the stock sale. During trial, Miller recalled that the parties exchanged draft contracts similar in language to exhibit 361.

According to Ed Miller, the only asset of value to Ascentium was Miller's client portfolio. Miller planned to retire on the sale of his interest in Miller.WhiteRunkle.

During trial, CPA Zoe Foltz testified that the founders of WhiteRunkle first retained her services in 1988. Foltz testified to the character of Ed Miller's ownership of

WhiteRunkle, the conversion of the debt owed him by the corporation to paid-in capital,

and the character of the proceeds from the sale of Miller.WhiteRunkle to Ascentium.

In this appeal, Rita Smith emphasizes a portion of Zoe Foltz's testimony

concerning Ed Miller's use of a wage bonus accrued during the committed intimate

relationship:

> [SALINA:]  Additional contribution to equity.  Did Mr. Miller pay an additional contribution of equity known as paid in capital?
> [FOLTZ:]  Yes.
> [SALINA:]  How much was that?
> [FOLTZ:]  $359,850.
> [SALINA:]  Was any of that $359,850 applied towards the acquisition of stock?
> [FOLTZ:]  Yes.
> [SALINA:]  The acquisition of what stock?
> [FOLTZ:]  Ed's 458 shares.

RP (July 24, 2017) at 130.  Rita Smith ignores Foltz's testimony, which

immediately followed:

> [SALINA:]  The 359,850 was—I thought he already owned that stock?
> MS. SCHULTZ:  Objection.  Leading.  Witness has answered the question.
> THE COURT:  Sustained.
> [SALINA:]  (By Mr. Salina)  The 359,850, did that go toward the acquisition of the stock or did it go towards creating additional stockholder's equity?
> [FOLTZ:]  I understand now.  Correct.
> [SALINA:]  Let's start over and you can answer that.
> [FOLTZ:]  All right.

[SALINA:] Did the 359,850 apply towards the acquisition of the stock?

[FOLTZ:] No.

[SALINA:] Say that again. Did 359,850—

MS. SCHULTZ: Objection as to vague, unless counsel identifies the stock. Are you talking about the 458 shares?

MR. SALINA: There's only 458 shares. Only been 458 shares.

MS. SCHULTZ: That's your theory.

THE COURT: Sustained. He can rephrase his question.

[SALINA:] (By Mr. Salina) Has Mr. Miller ever owned anything other than 458 shares of Miller.WhiteRunkle?

[FOLTZ:] No.

[SALINA:] Did his share ownership at all increase, the number of shares increase as a consequence of the redemption?

[FOLTZ:] No.

[SALINA:] Did this $359,850 get applied towards the acquisition of any shares?

[FOLTZ:] No.

[SALINA:] Did it get applied against the redemption of any shares?

[FOLTZ:] No.

1 RP (July 24, 2017) at 130-32.

CPA Todd Carlson testified to a tracing analysis performed by him of Ed Miller's financial investment accounts. The analysis isolated funds deemed community property from funds considered separate property. Carlson reviewed voluminous financial records, bank statements, investment records, and tax returns to formulate his testimony. The dissolution court admitted his tracing report, exhibit 109, into evidence.

Todd Carlson began his tracing analysis with the assumption that Ed Miller's and Rita Smith's relationship began in December 2003. Under the analysis, Carlson treated deposits into accounts, after the beginning of the relationship, as a community contribution unless records showed the deposit originated from a separate property source. Carlson allocated payments from Ascentium as Miller's separate property. Carlson also traced account withdrawals to either community purposes or separate purposes, and allocated the withdrawals accordingly.

The following colloquy occurred at trial between Todd Carlson and Ed Miller's counsel:

> [SALINA:] Pretty simple up until this point. And then we get to 2008. Mr. Miller has sold his Ascentium stock and he starts receiving these massive transfers of wealth into this account?
> [CARLSON:] Correct.
> [SALINA:] And that first deposit that is made is January 2 of '08 and there's $625,000 you talked about earlier?
> [CARLSON:] Correct.
> [SALINA:] Let's go to Note 3. And there is your note where you said you had in your tracing evidence of the proof of that. So what was the proof that that came from Ascentium?
> [CARLSON:] Note 3 says that the RBC Wealth Management account, the account statement received wired funds from Evergreen Seattle, 3294. Evergreen is the escrow note servicing company collecting payments from Ascentium on behalf of Mr. Miller from the sale of Miller.WhiteRunkle.
> [SALINA:] Is there any doubt in your mind that this 625 came from the sale of stock?
> [CARLSON:] No.

13

[SALINA:]  And you applied the entirety of that to Mr. Miller's separate property column; is that correct?

[CARLSON:]  Correct.

[SALINA:]  Now for the first time we have some withdrawals from this account.

[CARLSON:]  Yes.

[SALINA:]  And that's $99,000.  And let's go to Note 4, and tell us what Note 4 summarizes.

[CARLSON:]  There were two checks or withdrawals that were deposited in the Horizon account, one on April 14, 2008 and other September 15 of 2008, and they totaled $99,000.

[SALINA:]  All right.  Now if you look at page 5483, you reduced Mr. Miller's separate property column by that $99,000?

[CARLSON:]  Correct.

[SALINA:]  So you've apparently assumed that that's a separate liability.  What consideration did you take there?

[CARLSON:]  The tax returns and information I had was [sic] pretty clear that these were due to tax liabilities associated with the sale.  And so because it was, because it was such, I felt that proper to categorize it as separate property rather than community property withdrawals.

[SALINA:]  So the 625 you treated as a separate income and the $99,000 was an encumbrance of tax on that income, so you reduced it from his separate property?

[CARLSON:]  That's what I determined, yes.

1 RP (July 24, 2017) at 191-93.

Todd Carlson traced all but $91,126 of the $2,607,661 paid by Ascentium to each account listed in his schedules.  Rita Smith did not proffer a tracing expert to rebut any of Carlson's testimony.

Ed Miller's real estate appraiser, Randy Berg, testified at trial.  He acknowledged that when a fire destroys a home, the property's value may be appraised solely on the

14

value of the land on which the home sits. According to Berg, the land value of the

Glennaire home in 2015 was $85,000. He never testified, however, that the fire to the

Glennaire residence completely destroyed the home or that the property's value should be

based solely on the value of the land immediately after the fire in 2015.

According to the Glennaire property tax information, the Glennaire home's total

value in 2014 equaled $348,800. In 2015, it equaled $361,900. In 2016, it equaled

$203,300, and in 2017 the home's total value was $206,300. Randy Berg did not appraise

the home during those years. Berg valued the residence, as of July 5, 2017, at $472,200.

By that time, the home no longer suffered any fire damage. Rita Smith presented no

testimony contesting Berg's appraisal.

After trial, the trial court entered a memorandum decision. The memorandum

introduced the primary disputes at trial:

> [T]he duration of the CIR [committed intimate relationship], the character
> of and tracing of proceeds from the sale of Miller.WhiteRunkle to
> Ascentium in 2007, the character of funds in certain accounts, the character
> of and percentage of ownership of the Glennaire residence, the character of
> and distribution of insurance proceeds from a June 2, 2015 fire that
> damaged the Glennaire residence and personal property, the character of
> ownership of a home on Radio Lane, an equitable lien in favor of the
> community on a home on Lake Coeur d'Alene, Idaho, certain recreational
> equipment, certain vehicles, and four tickets for Gonzaga University
> Basketball games.

Clerk's Papers (CP) at 507.

15

The trial court found that Ed Miller acquired all of his stock in WhiteRunkle in 1993. Miller's and Rita Smith's committed intimate relationship begin in December 2003. In 2005, WhiteRunkle, Inc. paid for the redemption of Jack White's and Randy Runkle's corporate stock from retained earnings and, thus, Miller paid no money from community property funds for the redemption that rendered him the sole stockholder in the company. Miller's corporate shares remained his separate property despite the intervening commencement of the relationship with Smith.

The trial court found that when Ed Miller sold his stock in Miller.WhiteRunkle in 2007, to Ascentium, the stock retained its separate property status. The dissolution court also characterized the payments by Ascentium as payments for corporate stock rather than for future wages or for Miller's promise not to compete.

The trial court adopted Todd Carlson's tracing analysis when entering findings about the nature of the Centaurus fund. As of January 31, 2017, the Centaurus account consisted of $760,818.00 in separate property funds of Ed Miller and $693,989 in community funds of the parties, for a total of $1,454,807.00. The respective percentages of the total were 52.3 percent and 47.7 percent. Nevertheless, the court found that the total in this account was actually $1,387,441.12 on July 13, 2017, not $1,454,807.00. Therefore, the trial court found 52.3 percent of $1,387,441.12 resulted in $725,631.69 of

16

separate property funds for Ed Miller. The trial court awarded each spouse $330,904.70 as one-half of each party's community property. It also awarded the $725,631.69 in separate funds to Miller.

The dissolution court ruled that the insurance proceeds from the fire at the Glennaire residence retained the same community or separate property character as the home. The couple received $275,131.04 in insurance proceeds for contents destroyed in the fire. The court deemed the proceeds to be community property and awarded each party $137,565.52.

Ed Miller sought an equitable lien on behalf of the community estate for improvements paid by the couple for Rita Smith's Coeur d'Alene lakefront property. He waived a right to any community property interest in the home resulting from the couple's payment of the mortgage on the home during the committed intimate relationship. The trial court denied an equitable lien for the improvements because of Ed Miller's inability to produce receipts or other records substantiating the expenses paid.

The dissolution court ruled that Ed Miller's residence on Radio Lane constituted separate property. The court found that Miller convincingly traced the payment for the purchase of and improvements to the home to his separate property. Miller purchased the abode after the couple's separation.

Finally, the trial court entered findings concerning the characterization and allocation of personal property, such as household goods, jewelry, vehicles, and insurance proceeds. The dissolution court characterized the Cobalt boat as Ed Miller's separate property because he purchased the boat before the committed intimate relationship. The court also found two 2002 Sea-Doo jet skis to be separate property of Miller.

The trial court found that Ed Miller satisfied the contempt award of $40,000 with separate property funds. Therefore, the court did not deduct the payment from Miller's distribution of community property.

The trial court, while relying on its findings and conclusions, awarded Rita Smith community assets valued at $718,761.49. Additionally, the trial court awarded Smith her separate property assets valued at $787,284.45. Smith's total award was $1,506,045.94. The dissolution court awarded Ed Miller community property valued at $630,992.49 and separate property valued at $1,992,875.70. Miller's total award was $2,623,868.19. The trial court ordered that Miller pay Smith some of his separate funds to satisfy some of Smith's community interest in the couple's assets.

Ed Miller proposed to fund part of Rita Smith's community property allocation with parts of his separate property. The trial court accepted Miller's proposal, in part.

The trial court ordered each party to pay their own attorney fees and costs. In support of the ruling, the dissolution court found that Rita Smith is ten years younger than Ed Miller and she has an education that enables her to work. Despite her education and work experience, Smith chose not to work. In addition, Smith received more than $1,500,000 in the dissolution decree.

## LAW AND ANALYSIS

*Issue 1: Whether the trial court erred when characterizing the proceeds from the sale of stock in Miller.WhiteRunkle sold to Ascentium by Ed Miller in 2007 as separate property?*

*Answer 1: No.*

On appeal, Rita Smith assigns numerous errors to the trial court findings. The assignment implicating the greatest sum of money concerns the trial court's characterization, as Ed Miller's separate property, of the proceeds of the sale of Miller.WhiteRunkle stock to Ascentium. Smith contends the proceeds constituted community property.

As part of a marriage dissolution, all of the spouses' property, both separate and community, comes before the court for distribution. *In re Marriage of Schwarz*, 192 Wn. App. 180, 188, 368 P.3d 173 (2016). The court establishes the character of property as

separate or community based on its character at the time of acquisition. *Marriage of Schwarz*, 192 Wn. App. at 189. Property acquired before marriage is separate property. RCW 26.16.010. Separate property will retain its separate character through all of its changes and transitions so long as it can be traced and identified. *In re Marriage of Skarbek*, 100 Wn. App. 444, 447, 997 P.2d 447 (2000). Property acquired during marriage is presumptively community property. *Marriage of Skarbek*, 100 Wn. App. at 449. Property acquired during the marriage takes on the character of the property used to acquire it. *In re Marriage of Zahm*, 138 Wn.2d 213, 223, 978 P.2d 498 (1999); *In re Marriage of Short*, 125 Wn.2d 865, 870, 890 P.2d 12 (1995). The court may distribute the separate property of one spouse to the other spouse as part of the dissolution, but the court must consider the nature of the property, as separate property or community property, when issuing its award. RCW 26.09.080. The trial court's characterization of property as community or separate is a question of law reviewed de novo. *Marriage of Schwarz*, 192 Wn. App. at 192; *Marriage of Skarbek*, 100 Wn. App. at 447.

Rita Smith astutely argues that the material asset sold in the 2007 sale to Ascentium was not Ed Miller's stock in Miller.WhiteRunkle, but a noncompete agreement whereby Miller sold his marital earning power between 2008 and 2011. Smith emphasizes section 5.5 of the stock purchase agreement that prohibits Miller from

competing with Ascentium or soliciting clients and employees for three years. While

relying on *Cirrito v. Cirrito*, 44 Va. App. 287, 605 S.E.2d 268 (2004), a Virginia Court of

Appeals decision, Smith contends that proceeds of a spouse's sale of his or her marital

earning ability through a noncompete agreement is community property.

In *Cirrito v. Cirrito*, the husband executed an agreement to sell his interest in a

telephone service company. In exchange for his shares in the company, the husband

received shares of the acquiring company, appointment as president of its consumer

division, and an annual salary of $375,000. Part of the sales agreement included a

noncompete provision providing the husband with $1 million within one year after his

termination with the acquiring company "provided he would not engage in any competing

business." *Cirrito v. Cirrito*, 44 Va. App. at 290-91. The parties married twelve days

after the husband executed the agreement. The husband complied with his obligation to

not compete and, one year after the marriage, received the $1 million. Virginia law

recognizes marital property, rather than community property. The trial court

characterized the payment as the husband's separate property rather than marital property.

On appeal, in *Cirrito v. Cirrito*, the wife argued that the $1 million payment

constituted marital property because the husband forewent competing with his employer

for one year after his employment ceased and this one-year window of time spanned the

21

marriage.  The *Cirrito* court analogized the noncompete agreement to a severance package.  The $1 million replaced lost earnings during the period of time the husband declined competition with the acquiring company.  Although the agreement was negotiated prior to the marriage, the right to receive payment was contingent on the husband not engaging in a particular business in the future.  Accordingly, the *Cirrito* court concluded that the payment for not competing constituted marital property because the right to receive the money accrued during the marriage.

*Cirrito v. Cirrito* holds distinguishing factors from the sale of Miller.WhiteRunkle to Ascentium by Ed Miller.  Unlike the husband in *Cirrito*, Ed Miller did not go to work for the acquiring company, Ascentium.  Miller did not take a salary from Ascentium.  Miller planned to retire on the sale of Miller.WhiteRunkle to Ascentium.  Thus, Ascentium payments did not replace Miller's work earnings.  The tax returns of Miller and Rita Smith for the years 2007, 2008, 2009, and 2010 characterize the sale as one of corporate shares.  Rita Smith garnered tax benefits by this characterization.  Ed Miller testified that the one thing of value purchased by Ascentium by reason of receiving the corporate stock of Miller.WhiteRunkle was the company's client portfolio.  This testimony confirms that Ascentium principally desired an asset of the corporation not

work from Ed Miller. Miller's agreement not to compete protected Ascentium's purchase of this important asset.

Rita Smith highlights language in the stock purchase agreement that Ed Miller's promise not to compete or to solicit clients was an essential and material term of the purchase. We agree that this strong language bolsters Smith's argument, but the language did not read that Miller's promise was the only material or essential term. Other evidence supports a finding that Ascentium purchased a going concern with valuable clients.

In her appeal brief, Rita Smith misstates testimony and findings of fact in order to support her argument that Ed Miller sold to Ascentium Miller's right to future wages, not shares of stock. For example, Smith writes that Ed Miller conceded at trial that the price paid by Ascentium for the purchase of the stock reflected earnings replacement. Smith cites page 869 of the report of proceedings for this purported concession. Ed Miller made no such concession. Miller testified that his financial analyst projected a sales price that would generate an acceptable cash flow. An acceptable cash flow can come from an investment as well as from working wages. Smith also contends that her former husband confirmed, on the same page of the report of proceedings, he knew he was selling his forbearance from earning income. Miller did not so testify.

23

Rita Smith writes, in her appeal brief, that the trial court found that Ascentium and Ed Miller structured the sale of Miller.WhiteRunkle as a stock sale in order to avoid taxation on sums paid as ordinary income to lower taxes owed. The dissolution court found that, based on trial testimony, Ed Miller sold shares of stock to Ascentium. The trial court further found that a stock sale reduced taxes because Miller needed to only pay capital gains taxes. The court never found, however, that the parties structured the sale as one of corporate shares of stock in order to reduce taxes.

We agree with Rita Smith that earnings arising from a spouse's services performed during the marriage constitute community property. Nevertheless, the dissolution court concluded, based on clear and convincing evidence, "that the sale was a stock sale and not a payment for future wages or some other characterization." CP at 624-25. Substantial evidence supports the trial court's findings.

*Issue 2: Whether the trial court erred when characterizing the stock in Miller.WhiteRunkle sold to Ascentium by Ed Miller in 2007 as separate property?*

*Answer 2: No.*

In the alternative, Rita Smith contends that, even if the 2007 Ascentium purchase is properly characterized as a sale of stock, the trial court erred in awarding its proceeds to Ed Miller as his separate property because the stock sold was a community asset

24

acquired in 2005 with one of Miller's wage bonuses. The wage bonus would be community property since earned during the committed intimate relationship with Smith.

As explained before, property acquired during the marriage takes on the same character as the funds used to purchase it. *In re Marriage of Chumbley*, 150 Wn.2d 1, 6, 74 P.3d 129 (2003). Years before Ed Miller and Rita Smith had a committed intimate relationship, Miller acquired 458 shares in WhiteRunkle, which constituted 5 percent of the corporation's total shares. The stock was then his separate property at least as to Rita Smith. *In re Marriage of Schwarz*, 192 Wn. App. 180, 189, 368 P.3d 173 (2016).

On October 1, 2005, WhiteRunkle redeemed the total shares of Jack White and Robert Runkle for $1 million. The total number of shares owned by Miller did not increase or decrease as a consequence of the redemption. Nevertheless, he became the sole shareholder.

Following the October 2005 redemption, Ed Miller loaned Miller.WhiteRunkle $375,000. The loan represented unpaid compensation, in the form of a shareholder loan, owed to Miller. The Miller.WhiteRunkle tax return for fiscal year December 1, 2005 to November 30, 2006, recorded the shareholder loan of $375,000. On November 30, 2007, the corporation converted the shareholder loan to $359,850 in additional paid-in capital.

As CPA Zoe Foltz noted, this recharacterization of the loan as paid-in capital did not increase or decrease Miller's stock.

Rita Smith highlights the portion of Zoe Foltz's testimony that the new corporation, Miller.WhiteRunkle, repaid Ed Miller a $375,000 wage bonus by issuing him 458 shares of stock. In turn, Smith contends this testimony establishes that the 458 shares of stock in the corporation must be community property since Miller earned the wage bonus during the committed intimate relationship. Whereas, Foltz provided this testimony, the testimony conflicted with the facts shown in financial records. The records did not support Miller acquiring any stock in 2005. He acquired the shares in 1993. His amount of shares never increased. Miller's loan to the corporation in 2005 had no relationship to WhiteRunkle's redemption of White's and Runkle's stock. Miller loaned the money two months after completion of the redemption. The loan increased Miller's tax basis for the stock, but the change in basis does not equate to a change in the value of the stock, a sale of the stock, or a transfer of the stock. Also, Foltz later corrected her testimony. The dissolution court, based on the evidence as a whole, could reasonably conclude that the wage bonus did not purchase any of the corporate stock.

*Issue 3: Whether the trial court erred when characterizing Ed Miller's ownership in the Radio Lane home as his separate property?*

*Answer 3:  No.*

Rita Smith contends that the trial court committed reversible error when it characterized Ed Miller's Radio Lane residence as separate property because Miller purchased the home with the 2007 Ascentium sale proceeds.  This argument, of course, assumes that the proceeds from the stock sale were separate property.  We have already affirmed the trial court's ruling to the contrary.

Ed Miller purchased the Radio Lane home in April 2015 after the couple's separation.  Miller's tracing expert, CPA Todd Carlson, determined that Miller employed proceeds from the sale of stock to Ascentium to purchase the home.

*Issue 4:  Whether the trial court erred when refusing to characterize the value Rita Smith created in the Glennaire home as her separate property when she increased its value with post-separation labor and insurance proceeds?*

*Answer 4:  No.*

Before the parties' relationship, Rita Smith and her former husband owned the Glennaire home.  Ed Miller moved into the residence in December 2003.  When Miller switched domiciles, the parties engaged in a transaction by which Miller gained a 77.15 percent separate property interest in the Glennaire residence and Rita Smith retained a 22.85 percent separate property interest.  In 2015, post-separation, the Glennaire home

27

sustained fire damage.  The dissolution court ruled that the fire insurance proceeds

assumed the character of the home, and, thus, the court distributed the insurance proceeds

in accordance with the parties' relative ownership interests in the Glennaire home.  In so

ruling, the trial court relied on *In re Estate of Hickman*, 41 Wn.2d 519, 250 P.2d 524

(1952).

Rita Smith contends that the trial court should have characterized the fire insurance

proceeds used to restore the Glennaire residence as Smith's separate property.  She bases

this argument on the fact that she indirectly paid the insurance policy premium with her

separate funds after the parties' separation through the dissolution court's order to Ed

Miller to pay the premium as part of his spousal maintenance obligation.

Rita Smith relies on *Aetna Life Insurance Co. v. Wadsworth*, 102 Wn.2d 652,

689 P.2d 46 (1984) to support her argument.  The *Aetna* court held that the community or

separate character of a term *life insurance* policy depends on the character of the funds

used to pay the most recent premium.  The court in *In re Estate of Bellingham*, 85 Wn.

App. 450, 454, 933 P.2d 425 (1997), extended this concept to mortgage life insurance

policies.  Applying the rule in *Aetna*, the *Bellingham* court held that "paying insurance

premiums with community funds renders the policy community property."  *Estate of

Bellingham*, 85 Wn. App. at 454.

Rita Smith asks this court to extend the *Aetna* rule to fire insurance policies. Smith contends that the Supreme Court implicitly overruled *Estate of Hickman*, 41 Wn.2d 519 (1952) in *Aetna Life Insurance Co. v. Wadsworth*. We disagree. In *Bellingham*, the trial court relied on *Hickman* when it characterized the mortgage insurance proceeds as the estate's separate property. In holding that *Aetna* applied, the court found that the trial court's reliance on *Hickman* was misplaced. "Those cases concern fire insurance proceeds, which the court held assumed the character of the *property* insured." *Estate of Bellingham*, 85 Wn. App. at 455. Because *Bellingham* concerned life insurance rather than fire insurance, the court held that the *Hickman* line of cases does not apply.

We apply *Bellingham*'s logic inversely. Because this appeal concerns fire insurance rather than life insurance, the *Aetna* line of cases do not apply. Overruling *Hickman* should come expressly from the Supreme Court.

Rita Smith also contends that her percentage of separate property ownership interest in the Glennaire residence should increase because of the labor she performed in restoring the abode after the fire. Smith contends that she should be credited with the difference between the land value of the Glennaire home, $85,000, and the appraised value of the home, which is $480,000. We disagree.

29

We fault Rita Smith's analysis for many reasons. First, Smith emphasizes the real estate appraiser's testimony that, when a fire destroys a home, the property's value may be based solely on the value of the land. This observation has no relevance to the Glennaire residence. Smith provided no testimony that the fire completely demolished the home and that the property's value, after the fire, was only $85,000. Second, Smith's contention assumes that her labor alone restored the home and created the $480,000 value. But insurance proceeds paid construction contractors to restore the home. Third, Smith provided no testimony as to the value of her services that restored the Glennaire home after the fire.

Smith correctly cites *In re Marriage of DeHollander*, 53 Wn. App. 695, 699-700, 770 P.2d 638 (1989) for the assertion that, when one party contributes her separate property to the marital community's property, the contributor may have a right of reimbursement. As already stated, however, Smith supplied no evidence of the value of her labor or any evidence of the extent to which her labor increased the value of the Glennaire property.

30

*Issue 5: Whether the dissolution court erred when characterizing Rita Smith's right to $355,131 of Safeco "contents" proceeds as community property when she paid the latest premium on the insurance policy and the fund was acquired by Smith with post-separation labor and maintenance income?*

*Answer 5: No.*

Rita Smith contends that the trial court mischaracterized the $355,131 of Safeco fire insurance "contents coverage" as community property. Smith argues that she paid the latest premium payment on the homeowners' insurance policy. She further contends that her inventorying, cleaning, and storage of the damaged personal property inside the Glennaire residence entitles her to the insurance payment as her separate property.

We already affirmed the trial court's ruling that the character of the insurance proceeds, regardless of who paid the premium, follows the character of the ownership of the property destroyed. We assume, without contrary evidence, that the parties accumulated the contents inside the home during the marriage. We further must presume that property acquired during the marriage and not traced to a separate property origin is community property. *In re Marriage of Skarbek*, 100 Wn. App. 444, 449, 997 P.2d 447 (2000).

Rita Smith asserts that contents inside the home are not realty and, therefore, the rule equating insurance proceeds to restore the residence to the same as the character of the home should not apply. Nevertheless, Smith cites no authority for this contention. We do not consider conclusory arguments that do not cite authority. RAP 10.3(a)(6). Smith also cites no authority for the proposition that one's creation of the inventory for damaged or destroyed personal property entitles that person to sole ownership of the insurance proceeds attributed to the property.

*Issue 6: Whether the dissolution court erred when characterizing the 2008 Cobalt boat as Ed Miller's separate property?*

*Answer 6: Yes.*

In 2008, Ed Miller purchased a 2008 Cobalt boat. The certificate of title, issued on September 29, 2008, included Rita Smith's name as owner. The dissolution court found the 2008 vessel to be Miller's separate property because Miller acquired the boat before the parties' 2003 committed intimate relationship. We agree with Rita Smith that the trial court erred.

We take judicial notice that a 2008 model boat cannot be purchased during or before 2003. Thus, we apply the presumption that an asset acquired during the marriage is community property.

Ed Miller testified that he believed the boat was his separate property because he bought it with his separate funds. Nevertheless, he provided no other testimony to support a conclusion that he purchased the boat with separate funds. A party may rebut a presumption of community property by offering clear and convincing evidence that the property was acquired with separate funds. *In re Marriage of Schwarz*, 192 Wn. App. 180, 189, 368 P.3d 173 (2016). Miller's averment of his belief does not supply clear and convincing evidence.

*Issue 7: Whether the trial court abused its discretion in failing to assess against Ed Miller's distribution of property $802,840 of funds he dissipated from the Centaurus fund and D.A. Davidson accounts while the dissolution action was pending?*

*Answer 7: No.*

Rita Smith next contends that the trial court abused its discretion when refusing to assess against Ed Miller's share of the property $802,840 in assets he dissipated. Citing trial exhibit 109, Smith alleges Miller depleted $1,556,036 from the community investment accounts in the Centaurus fund and D.A. Davidson accounts. Washington courts recognize a party's dissipation of marital assets as relevant to the just and equitable distribution of property. *In re Marriage of Williams*, 84 Wn. App. 263, 270, 927 P.2d 679 (1996).

During the pendency of the marital dissolution proceeding, the trial court held Ed Miller in contempt because of his unauthorized withdrawal of funds. The trial court ordered Miller to pay Rita Smith $29,383.50 in attorney fees and costs and $10,000.00 in sanctions. The dissolution court reserved for later a ruling on the nature of the funds unlawfully withdrawn, as either separate property or community property.

The trial court ultimately recognized that Ed Miller took $766,196 from the Centaurus fund to purchase the Radio Lane home, and Miller deposited $57,297 of the amount into a D.A. Davidson account. The trial court then accounted for the depleted D.A. Davidson account in its unchallenged findings and compensated Rita Smith her one-half interest in the $114,595 community account as set forth in section G of the decree. The trial court also acknowledged Miller's contempt payment of $40,000.

We cannot conclude, as alleged by Rita Smith, that Ed Miller depleted the Centaurus account by another $802,840. The trial court entered no such finding. Instead, the court relied on CPA Todd Carlson's tracing and found that, after analyzing the origin and source of deposits in the Centaurus fund, the account consisted of $760,818 separate property of Miller and $693,989 in community funds. In her opening brief, Smith cites numerous withdrawals from 2014 to 2017 totaling $1,297,196. Nevertheless, Carlson

testified regarding these withdrawals, and he characterized the funds withdrawn. The trial court accepted Carlson's characterization of the funds.

This court reviews a trial court's property division made during a marriage dissolution for manifest abuse of discretion. *In re Marriage of Muhammad*, 153 Wn.2d 795, 803, 108 P.3d 779 (2005). A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or reasons. *Marriage of Muhammad*, 153 Wn.2d at 803. We conclude that the trial court did not abuse its discretion regarding any alleged dissipation of the Centaurus fund by Ed Miller.

*Issue 8: Whether the trial court abused its discretion when it forced Rita Smith to buy Ed Miller's 14-year-old separate property Sea-Doos as part of its property distribution?*

*Answer 8: No.*

At trial, Rita Smith claimed the two 2002 Sea-Doo jet skis were community property because the couple purchased the skis during the committed intimate relationship. The trial court characterized the Sea-Doos as Ed Miller's separate property because Miller acquired them prior to the relationship as confirmed by their being mentioned in his divorce decree from his previous wife.

35

On appeal, Rita Smith may concede that the Sea-Doos constitute Ed Miller's

separate property and are correctly valued at $3,415. Smith now asserts, however, that

the trial court abused its discretion because the court forced her to buy Miller's Sea-Doos

from him by awarding them to Smith and then granting an offset for what it deemed the

value of these items against the community funds Miller owed Smith. With no citation to

authority, Smith asserts a forced sale on an unwilling party is abuse of discretion under

RCW 26.09.080's disposition authority. We do not consider conclusory arguments that

do not cite authority. RAP 10.3(a)(6).

Rita Smith also cites *In re Marriage of Bobbitt*, 135 Wn. App. 8, 15, 144 P.3d 306

(2006) for the proposition that the trial court has no jurisdiction to order the sale of the

parties' assets without their consent because the law does not grant the trial court such

authority. In *Bobbitt*, the trial court ordered the wife to sell a piece of property awarded

to the husband as his separate property in the dissolution decree. We do not know why

Smith cites this specific rule as *Bobbitt* does not readily apply to the facts of this case.

Rita Smith's trial court did not force either party to sell the two Sea-Doos. Smith had in

her possession and retained possession of the Sea-Doos.

*Issue 9: Whether the dissolution court failed to properly consider the*

*RCW 26.09.080 factors when it distributed the property?*

*Answer 9:  No.*

In a dissolution action, the property of the spouses, whether community or separate, comes before the court for distribution.  *Friedlander v. Friedlander*, 80 Wn.2d 293, 305, 494 P.2d 208 (1972).  RCW 26.09.080 guides the dissolution court to make such disposition of the property and liabilities "as shall appear just and equitable," based on consideration of the following factors:

> (1)  The nature and extent of the community property;
> (2)  The nature and extent of the separate property;
> (3)  The duration of the marriage or domestic partnership; and
> (4)  The economic circumstances of each spouse or domestic partner at the time the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to a spouse or domestic partner with whom the children reside the majority of the time.

The Washington Supreme Court reads RCW 26.09.080 to require trial courts to weigh all of the factors to come to a fair, just, and equitable division of property.  *In re Marriage of Konzen*, 103 Wn.2d 470, 478, 693 P.2d 97 (1985).  Character of the property is a relevant factor, but it is not controlling.  *Marriage of Konzen*, 103 Wn.2d at 478.  Under RCW 26.09.080, trial courts have broad discretion in the distribution of property in marriage dissolution cases.  *In re Marriage of Brewer*, 137 Wn.2d 756, 769, 976 P.2d 102 (1999).  Trial courts are in the best position to assess the assets and liabilities of the parties and determine what is fair, just, and equitable under all the circumstances.

*Marriage of Brewer*, 137 Wn.2d at 769. Thus, trial court distributions of property will seldom be changed on appeal. *In re Marriage of Stenshoel*, 72 Wn. App. 800, 803, 866 P.2d 635 (1993).

Rita Smith argues that the trial court abused its discretion in its consideration of the statutory factors because the trial court failed to consider the lack of liquidity of its award to Smith when compared with the need for her to pay a personal debt of $360,000. Nevertheless, Smith does not cite the record for her assertion that she bears $360,000 in outstanding debt.

The dissolution court wrote in its memorandum decision:

[T]his was a long and difficult case to reconcile competing positons and testimony. Ultimately, the Court relied on RCW 26.09.080 to reach a just and equitable decision.

CP at 508. A trial court's memorandum decision may supplement findings of fact and conclusions of law. *Ellerman v. Centerpoint Prepress, Inc.*, 143 Wn.2d 514, 523 n.3, 22 P.3d 795 (2001).

The trial court's statement in its memorandum decision coincides with its findings of fact and conclusions of law. Over the course of a nine-day trial, the court heard testimony from seven witnesses, including both parties and an expert who opined as to the origins of the various assets. The court reviewed 150 exhibits. In its sixteen-page

findings of fact and conclusions of law, the court carefully considered and resolved the

evidence and arguments before the court, including those bearing on the statutory factors.

The dissolution court heard evidence and made findings regarding the parties' ages,

health, education, and future earning potential. The court also made extensive

findings regarding the nature and extent of community and separate property, including a

finding that each party had significant assets. We conclude that the trial court relied on

RCW 26.09.080 to reach a just and equitable division of property.

*Issue 10:  Whether* the *trial court abused its discretion in denying Rita Smith*

*attorney fee assistance in the trial court?*

*Answer 10:  No.*

Rita Smith maintains that the trial court abused its discretion in declining to award

her attorney fees under RCW 26.09.140. This court reviews a trial court ruling regarding

fees under RCW 26.09.140 for an abuse of discretion. *In re Marriage of Kile & Kendall*,

186 Wn. App. 864, 888, 347 P.3d 894 (2015). Smith bears the burden of showing the

trial court exercised its discretion in a clearly untenable or manifestly unreasonable way.

*In re Marriage of Crosetto*, 82 Wn. App. 545, 563, 918 P.2d 954 (1996).

RCW 26.09.140 states in pertinent part:

> The court from time to time after considering the financial resources of both parties may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this chapter and for reasonable attorneys' fees or other professional fees in connection therewith, including sums for legal services rendered and costs incurred prior to the commencement of the proceeding or enforcement or modification proceedings after entry of judgment.

In general, when determining an award of fees, the trial court balances the needs of the requesting spouse against the ability of the other spouse to pay. *Marriage of Crosetto*, 82 Wn. App. at 563.

In *Marriage of Kile & Kendall*, 186 Wn. App. 864 (2015), the husband failed to show an abuse of discretion when the court did not award him attorney fees because the husband was awarded nearly $650,000 in assets.

Rita Smith asks for fees because this trial took nine days, had 2,000 pages of trial testimony, and 221 exhibits, 150 of which were admitted. The trial court refused to award attorney fees based on its finding that neither party demonstrated need. Each spouse received an estate in excess of $1 million. The court noted that Smith is 54 years of age and more than ten years younger than Ed Miller. The trial court also found that Smith had education and training that enabled her to work, but she chose to pursue a new career path through education. Finally, the trial court noted that Smith's decision not to

work contributed to her debts. Because of the substantial sum awarded Rita Smith, we conclude the trial court did not abuse its discretion.

*Issue 11: Whether the trial court erred in failing to award Rita Smith separate liens against the community property or against Ed Miller's separate property when Smith contributed cash to the community from a separate tort claim and because of the rental and use value she gave to the community of the Lake Coeur d'Alene home?*

*Answer 11: We decline to address this issue because Rita Smith presents no argument in her brief to support this assignment of error.*

Rita Smith assigns error to the trial court's failure to award her an equitable lien for tort settlement proceeds of over $300,000 and the rental and use value of the lake home of $750,000. Smith only referenced this argument in her assignments of error section of her opening brief and extended no argument or analysis to this issue in her brief.

Without argument or authority to support it, an appellant waives an assignment of error. *Bercier v. Kiga*, 127 Wn. App. 809, 824, 103 P.3d 232 (2004). This court need not consider arguments that are not developed in the briefs and for which a party has not cited authority. *Bercier v. Kiga*, 127 Wn. App. at 824. Because Rita Smith failed to develop or

support her argument regarding her request for separate liens, we decline to address this assignment of error.

*Issue 12: Whether this reviewing court should direct the dissolution court to order additional maintenance payments in favor of Rita Smith?*

*Answer 12: No.*

Rita Smith asks that maintenance be assessed on remand because Ed Miller continues to dissipate and transfer funds during the pendency of this appeal. Smith cites *Marriage of Kile & Kendall*, 186 Wn. App. 864, 887 (2015) for this assertion. *Marriage of Kile & Kendall*, however, did not involve a situation when one party dissipated funds during the appellate process. Smith presents no evidence on appeal that Miller continues to squander any funds.

*Issue 13: Whether this court should award Rita Smith reasonable attorney fees and costs incurred on appeal?*

*Answer: No.*

Rita Smith also asks this court to order Ed Miller to pay her attorney fees on appeal, while claiming she has need and Miller the ability to pay under RCW 26.09.140. Under RCW 26.09.140, this court may award attorney fees on appeal after considering the financial resources of the parties. This court also has discretion to award fees and costs

on appeal based on a showing of intransigence or need.  *In re Marriage of Buchanan*, 150 Wn. App. 730, 740, 207 P.3d 478 (2009).

RAP 18.1(c) requires a party, in a dissolution action, to file an affidavit of financial need if seeking an award of reasonable attorney fees and costs on appeal.  In her affidavit, Rita Smith testifies that she currently receives no monthly income and incurs monthly expenses of $4,839.62.  Smith also avers that she received a total net distribution at the conclusion of the marital dissolution of $77,854.

We do not deem Rita Smith's financial affidavit believable, when the dissolution court awarded her more than $1.5 million in assets.  We also follow the trial court's finding that Rita Smith voluntarily chose unemployment despite having a good education and previously accruing $80,000 per year in marketing.  Thus, we deny Rita Smith reasonable attorney fees and costs on appeal.

## CONCLUSION

We remand to the trial court for a recharacterization and redistribution of the Cobalt boat as a marital community asset.  We otherwise affirm the trial court's property distribution and other rulings.  We deny Rita Smith an award of reasonable attorney fees and costs on appeal.

No. 36040-7-III
*In Marriage of Miller & Yturri-Smith*

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Fearing, J.

WE CONCUR:

Lawrence-Berrey, C.J.

Korsmo, J.